**2013-1347**

# United States Court of Appeals
# for the Federal Circuit

BOSE CORPORATION,

*Plaintiff-Appellant,*

*v.*

SDI TECHNOLOGIES, INC.,

*Defendant-Appellee,*

*and*

IMATION CORPORATION, MEMOREX PRODUCTS, INC., and D.P.I., INC.,

*Defendants-Appellees,*

*and*

3XM CONSULTING, LLC,

*Defendant.*

*Appeal from the United States District Court for the District of Massachusetts in Case No. 09-CV-11439, Judge William G. Young.*

## DEFENDANTS-APPELLEES' JOINT RESPONSE BRIEF

Matthew B. Lowrie, Esq.
mlowrie@foley.com
Aaron W. Moore, Esq.
amoore@foley.com
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Telephone: 617-342-4000
Facsimile: 617-342-4001

*Attorneys for SDI Technologies, Inc*

Michael Lee Nepple, Esq.
mnepple@thompsoncoburn.com
David B. Jinkins, Esq.
djinkins@thompsoncoburn.com
THOMPSON COBURN LLP
One U.S. Bank Plaza
St. Louis, MO 63101
Telephone: 314-552-6000
Facsimile: 314-552-7000

*Attorneys for Imation Corp.,
Memorex Products, Inc. and DPI, Inc.*

Form 9

FORM 9. Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Bose Corporation _____ v. SDI Technologies, Inc., et. al. _____

No. 2013-1347 _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

SDI Technologies, Inc. _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

SDI Technologies, Inc.

---

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

SDI Technologies, Inc.

---

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

---

4. ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Matthew B. Lowrie, Aaron W. Moore, Lucas I. Silva, Robert J. Silverman, Kimberly Dodd, of Foley & Lardner LLP

---

MAY 7, 2013 _____
        Date

_____
        Signature of counsel

Matthew B. Lowrie _____
        Printed name of counsel

Please Note: All questions must be answered

cc: Service List _____

i

**Form 9**
**FORM 9. Certificate of Interest**

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Bose Corporation _____ v. SDI Technologies, Inc. _____

No. ___ 13-1347 _____

## CERTIFICATE OF INTEREST

Counsel for the Appellee Imation Corporation and Memorex Products, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

_____ Imation Corporation and Memorex Products, Inc. _____

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

_____ Imation Corporation and Memorex Products, Inc. _____

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

_____ Imation Corporation does not have any parent corporation; Memorex Products, Inc. is a wholly owned subsidiary of Imation Corporation; TDK Corporation, a publicly held company, owns more than 10% of Imation Corporation's stock. _____

4.  ☐ The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:
**Prince Lobel Tye LLP:** Robert A. Bertsche, Jeffrey Jackson Pyle, and Paige A. Scott Reed;
**Thompson Coburn LLP:** Matthew A. Braunel, Steven E. Garlock, Matthew J. Himich, David B. Jinkins, Fredericka B. Jura, Jonathan G. Musch, Michael L. Nepple, Alan H. Norman, Mark Sableman, and Benjamin R. Askew.

_____        _____ *Michael Nepple* _____
                                         Signature of counsel

_____        Michael L. Nepple _____
                                         Printed name of counsel

Please Note:  All questions must be answered
cc: _____

---

ii

Form 9
**FORM 9.  Certificate of Interest**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Bose Corporation _____ v. SDI Technologies, Inc. _____

No. ___13-1347___

## CERTIFICATE OF INTEREST

Counsel for the Appellee DPI, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

_____DPI, Inc._____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

_____DPI, Inc._____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

_____No parent corporation; Rexel Worldwide (a/k/a Rexel), a publicly held company, owns more than 10% of DPI, Inc.'s stock._____

4.  ☐  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:
**Prince Lobel Tye LLP**: Robert A. Bertsche, Jeffrey Jackson Pyle, and Paige A. Scott Reed;
**Thompson Coburn LLP**: Matthew A. Braunel, Steven E. Garlock, Matthew J. Himich, David B. Jinkins, Fredericka B. Jura, Jonathan G. Musch, Michael L. Nepple, Alan H. Norman, Mark Sableman, and Benjamin R. Askew.

_____          _____
                                 Signature of counsel

_____          Michael L. Nepple
                                 Printed name of counsel

Please Note:  All questions must be answered
cc: _____

iii

# TABLE OF CONTENTS

*Page*

CERTIFICATES OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ....................................................................vi

STATEMENT OF RELATED CASES ...................................................1

STATEMENT OF JURISDICTION.......................................................3

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE.................................................................5

STATEMENT OF FACTS .......................................................................6

I.      THE '765 PATENT ...................................................................6

II.     THE SPECIFICATION'S TWO EMBODIMENTS.....................8

III.    UNIT, DEVICE, AND MODULE ............................................14

IV.     THE PROSECUTION HISTORY OF THE '765 PATENT.........14

V.      THE PROSECUTION HISTORY OF THE CONTINUATIONS
        OF THE '765 PATENT..............................................................17

VI.     DISTRICT COURT'S CLAIM CONSTRUCTION .....................18

VII.    THE ACCUSED PRODUCTS....................................................19

VIII.   AT NO TIME DID ANY DEFENDANT POSSESS THE
        SPECIFIC INTENT TO INFRINGE THE '765 PATENT ..........19

        A.      SDI.................................................................................19

        B.      Imation..........................................................................21

        C.      DPI.................................................................................22

SUMMARY OF ARGUMENT .............................................................24

ARGUMENT ................................................................................................. 28

I.      STANDARD OF REVIEW ................................................................... 28

II.     LEGAL PRINCIPLES ......................................................................... 28

III.    THE DISTRICT COURT CORRECTLY CONSTRUED THE
        TERM "INTERFACE." ........................................................................ 30

        A.      The District Court's Construction is Consistent with the
                Plain Meaning of "Interface". .................................................. 30

        B.      The District Court Correctly Read the Claims in Light of
                the Specification. ...................................................................... 32

        C.      These Claims Do Not, And Do Not Have To, Cover the
                Figure 1 Embodiment. ............................................................... 33

        D.      The Prosecution History of the '765 Patent Confirms the
                District Court's Interpretation. ................................................. 34

        E.      Subsequent Prosecution History Confirms the District
                Court's Interpretation. .............................................................. 36

        F.      The District Court's Construction is Confirmed by the
                Extrinsic Evidence .................................................................... 37

                1.      Dictionary Definitions ................................................... 37

                2.      The Wave/PC Product ..................................................... 37

                3.      Inventor Testimony ........................................................ 41

                4.      Reexamination ............................................................... 41

                5.      Imation Opinion ............................................................. 42

        G.      The District Court's Construction is Consistent with the
                Claims ........................................................................................ 42

                1.      Claim 24 Does Not Support Bose's Argument .............. 42

                2.      Claim 29 Does Not Support Bose's Argument .............. 45

IV.  THE DISTRICT COURT CORRECTLY CONSTRUED
     UNIT/DEVICE/MODULE...................................................................47

     A.   Bose Has Waived Any Claim Construction Argument on
          These Terms. .......................................................................47

     B.   Even if Not Waived, Bose's Argument is Clearly Wrong.................48

     C.   Claim 37 Does Not Support Bose's Argument ...................................50

V.   UNDER THE CORRECT CONSTRUCTIONS, NO COMMON
     PRODUCT CAN INFRINGE THE CLAIMS .............................................52

     A.   The District Court's Claim Construction Explicitly
          Requires *"A Structure"* Lacking From The Common
          Products. ..............................................................................53

     B.   The Common Products Do Not Infringe Because They
          Operate Similar to the Excluded Figure 1 Embodiment. ....................55

VI.  SUMMARY JUDGMENT IS ALSO APPROPRIATE
     CONCERNING INDIRECT INFRINGEMENT. .........................................56

     A.   Intent to Infringe Is A Requirement for Both Contributory
          and Induced Infringement and Absent on this Record........................57

     B.   The District Court Correctly Determined That SDI Lacked
          The Necessary Intent to Indirectly Infringe the '765 Patent. ..............61

     C.   With Respect to the Common Products This Court Can
          Affirm the District Court on the Alternative Ground that
          Bose Failed to Establish A Material Issue of Fact
          Concerning Intent. ................................................................65

          1.   The District Court's Conclusion Concerning the
               iW1 Compels A Finding of No Intent With Respect
               to SDI's Other Products...............................................66

          2.   The District Court's Findings Support the
               Alternative Ground that Imation Lacked The
               Necessary Intent to Indirectly Infringe the '765
               Patent. ..................................................................66

3.    The District Court's Findings Support the
Alternative Ground that DPI Lacked The Necessary
Intent to Indirectly Infringe the '765 Patent. ............................ 68

D.    Bose Waived Any Right to a Trial On "Future
Infringement" ......................................................................... 69

CONCLUSION ..................................................................................... 70

CERTIFICATE OF SERVICE ............................................................... 71

CERTIFICATE OF COMPLIANCE ....................................................... 72

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Anderson v. Liberty Lobby,*
   477 U.S. 242 (1986) .................................................................. 61, 62

*Applied Med. Res. Corp. v. U.S. Surgical Corp.,*
   435 F.3d 1356 (Fed. Cir. 2006) ................................................. 58, 65

*August Tech. Corp. v. Camek, Ltd.,*
   655 F.3d 1278 (Fed. Cir. 2011) .........................................................33

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP,*
   616 F.3d 1249 (Fed. Cir. 2010) .........................................................30

*Borg Warner, Inc. v. Honeywell Int'l, Inc.,*
   750 F. Supp. 2d 596 (W.D.N.C. 2010)...............................................63

*Carramerica Realty Corp. v. nVidia Corp.,*
   No. C 05-00428JW, 2010 WL 2629760 (N.D. Cal. June 29, 2010)..................61

*CCS Fitness, Inc. v. Brunswick Corp.,*
   288 F.3d 1359 (Fed. Cir. 2002) ................................................. 47, 49

*Commil USA, LLC v. Cisco Sys., Inc.,*
   720 F.3d 1361 (Fed. Cir. 2013) ................................................. 57, 58

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,*
   424 F.3d 1293 (Fed. Cir. 2005) .........................................................49

*CVI/Beta Ventures, Inc. v. Tura LP,*
   112 F.3d 1146 (Fed. Cir. 1997) ................................................... 36-37

*DSU Med. Corp. v. JMS Co.,*
   471 F.3d 1293 (Fed. Cir. 2006) ................................................... 56-57

*Global-Tech v. SEB,*
   131 S.Ct. 2060 (2011) ........................................................................57

*Golden Blount, Inc. v. Robert H. Peterson Co.,*
   438 F.3d 1354 (Fed. Cir. 2006) ........................................... 58, 59, 65

*Gross Int'l. Am., Inc. v. Graphic Mgmt. Assoc., Inc.,*
   739 F. Supp. 2d 1089 (N.D. Ill. 2010)...............................................60

*Harris Corp. v. Ericsson Inc.,*
   417 F.3d 1241 (Fed. Cir. 2005).........................................................65

*Holmes Grp., Inc. v. RPS Prods., Inc.*, No. 03-40146,
2010 WL 7867756 (D.Mass. June 25, 2010) ......................................................63

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
540 F.3d 1337 (Fed. Cir. 2008) ......................................................................41

*Hoyos v. Telecorp Commc'ns, Inc.*,
488 F.3d 1 (1st Cir. 2007) ..............................................................................60

*In re Am. Acad. Of Sci. Tech Ctr.*,
367 F.3d 1359 (Fed. Cir. 2004) ......................................................................42

*In re Yamamoto*,
740 F.2d 1569 (Fed. Cir. 1984) ......................................................................41

*Ingram v. Brink's, Inc.*,
414 F.3d 222 (1st Cir. 2005) ..........................................................................60

*Kolmes v. World Elastic Corp.*, No. 4:93CV00719,
1995 WL 918081, (M.D.N.C. Sept. 18, 1995) ................................................60

*Manville Sales Corp. v. Paramount Sys., Inc.*,
917 F.2d 544 (Fed. Cir. 1990) ........................................................................60

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) ................................................................... 28, 30

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
244 F.3d 1365 (Fed. Cir. 2001) ......................................................................58

*Mikkelsen Graphic Eng'g Inc. v. Zund Am., Inc.*, No. 07-c-391,
2011 WL 6122377 (E.D. Wisc. Dec. 8, 2011) ................................................59

*N. Am. Specialty Ins. Co. v. Lapalme*,
258 F.3d 35 (1st Cir. 2001) ...................................................................... 61, 66

*Novartis Pharms. v. Abbott Labs.*,
375 F.3d 1328 (Fed. Cir. 2004) ......................................................................29

*Novosteel SA v. United States*,
284 F.3d 1261 (Fed. Cir. 2002) ......................................................................61

*Perez v. Volvo Car Corp.*,
247 F.3d 303 (1st Cir. 2001) ..........................................................................66

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ............................................................. *passim*

*Praxair, Inc. v. ATMI, Inc.*,
543 F.3d 1306 (Fed. Cir. 2008) ......................................................................32

*Sears, Roebuck & Co. v. Goldstone & Sudalter*,
  128 F.3d 10 (1st Cir. 1997) ..................................................................62

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ...........................................................................69

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
  511 F.3d 1132 (Fed. Cir. 2007) ..................................................... 33-34

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
  831 F.2d 1017 (Fed. Cir. 1987) ...................................................... 50, 54

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) ..........................................................29

*Textron Innovations Inc. v. Am. Eurocopter Corp.*,
  498 Fed.Appx. 23 (Fed. Cir. 2012) .....................................................49

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ..........................................................49

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
  529 F.3d 1364 (Fed. Cir. 2008) ..........................................................33

*Vita-Mix Corp. v. Basic Holding, Inc.*,
  581 F.3d 1317 (Fed. Cir. 2009) ...................................................... 57, 58

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ...........................................................28

## STATEMENT OF RELATED CASES

On October 12, 2011, during the district court case, Defendant SDI Technologies, Inc. filed a Petition for Writ of Mandamus, requesting that this Court direct the district court to stay this case pending the outcome of an ongoing *inter partes* reexamination of the patent-in-suit. That petition, *In re SDI Technologies*, Misc. No. 105, before Circuit Judges Newman, Linn, and Reyna, was denied via a non-precedential order on January 12, 2012.

Defendants Imation Corp., Memorex Products, Inc., and D.P.I., Inc. are party to *inter partes* reexamination proceeding before the United States Patent and Trademark Office, Control No. 95/001,260, wherein the Board of Patent Appeals and Interferences affirmed the Examiner's rejection of all claims of the '765 patent as either anticipated or obvious in light of the art cited on multiple grounds. Bose demanded a remand to the Examiner in light an additional ground of rejection, the Examiner agreed with the Board and entered the new rejection, and the case is again before the Board.

There are multiple continuations of the '765 patent pending, and Bose is presently asserting two that have issued, U.S. Patent Nos. 8,364,295 and 8,401,682, against Appellee SDI in *Bose Corporation v. SDI Technologies, Inc.*, D. Mass. No. 13-cv-10277.

There are no other cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

The United States District Court for the District of Massachusetts had jurisdiction under 19 U.S.C. § 1331 and 1338(a).  The district court entered a final judgment on March 27, 2013.  Bose filed a Notice of Appeal on April 17, 2013.  This Court has appellate jurisdiction under 28 U.S.C. § 1295.

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether the district court properly construed the claim term "interface" to include a digital-to-analog converter, in accordance with the way the term is used in the specification.

2.      Whether the district court properly construed the claim terms "interface unit," "interface device," and "interface module" as "a structure that includes the interface" in accord with the intrinsic evidence, where the parties agree to that construction.

3.      Whether the district court properly granted summary judgment of noninfringement as to 143 of the 144 accused products because none contain an "interface unit," "interface device," or "interface module."

4.      Whether the district court properly granted summary judgment as to SDI's iW1 product (the 144th accused product), because "no reasonable jury could conclude that SDI had the requisite intent" to support a finding of indirect infringement.

## STATEMENT OF THE CASE

On August 28, 2009, Bose filed a complaint with the district court, accusing SDI Technologies, Inc., Imation Corp., Memorex Products, Inc., and D.P.I., Inc. ("Defendants" or "Appellees") as well as 3XM Consulting, LLC of infringing U.S. Patent No. 7,277,765 (the "'765 patent"). The Defendants denied infringement and raised defenses of, *inter alia*, patent invalidity. (A557-576; A583-591.)

On January 10, 2012, the Defendants moved for summary judgment of non-infringement on the grounds that (a) no accused products included the "interface" required by every independent claim and (b) no Defendant had the requisite intent to infringe. (A4056-88.)

Judge Young issued an Order granting the motion for summary judgment on July 10, 2012, correctly concluding that 143 of the 144 accused products did not include the required "interface," and that Defendant SDI did not have the requisite intent to indirectly infringe with respect to the 144th product. (A45-74.)

On February 22, 2013, Bose filed a status report requesting entry of final judgment to permit an appeal. On March 11, 2013, the Court entered final judgment. Bose then filed the instant appeal.

## STATEMENT OF FACTS

### I.    THE '765 PATENT

The '765 patent is generally directed to an audio system in which a computer is connected to a speaker unit and a remote controls the speaker directly (*e.g.*, controlling the speaker's volume) and also controls the computer that is supplying the music (*i.e.*, by starting or stopping playback), where the remote controls the computer through the speaker.

This is a straightforward application of existing technology, a fact confirmed by the Patent Trial and Appeal Board in affirming rejections of all of the claims of the '765 patent.  (A292-94.)

Bose incorrectly maintains that the '765 patent covers its SoundDock product.  The patent was written to cover an earlier, failed product called the Wave/PC, a version of which included the "interface" that appears in an embodiment depicted in Figure 2 of the specification and is present in every claim of the '765 patent.  Like the accused products, the SoundDock has no "interface."

Bose argued below that "interface" should be construed to mean "a connection."  (A79; A3003-05.)  The district court rejected that argument, finding that the "interface" in the '765 patent was more than just a "connection."  (A80-86.)

Evidently recognizing that its original argument was absurd, Bose filed a motion for reconsideration of the claim construction order, which was denied. (A4600-17; A34.)  The revised construction Bose presented in the reconsideration motion—"circuitry that receives an audio signal from an audio source and transmits digital control commands"—was just a wordier version of "a connection."  Generic "circuitry" is meaningless in this context—because the connection is electrical, it necessarily includes "circuitry."  There is nothing structural or functional to distinguish the new definition from the old, nor does Bose attempt to identify any distinction.

Bose's definitions both ignore the fundamental function of the "interface" in this patent (and in the art in general), which, in accordance with dictionary definitions and the specification, is to *convert* a signal or data from one type or format to another.  Here, the "interface" converts a computer-supplied digital audio signal to an analog audio signal that can be reproduced by a speaker.  (A134, col. 4, ll. 37-40; A81.)  Neither "a connection," nor "circuitry that receives an audio signal from an audio source and transmits digital control commands" reflects the role of the "interface" in the '765 patent.  Both embodiments include "circuitry that receives an audio signal from an audio source and transmits digital control commands."  The specification makes manifest, however, that the claimed "interface" is present only in the embodiment that requires conversion of a digital

audio signal to an analog audio signal.  The prosecution history confirms this fundamental function.

## II.    THE SPECIFICATION'S TWO EMBODIMENTS

In the first of the two described embodiments (the "Figure 1 Embodiment"), a computer outputs an analog audio signal via the analog "stereo jack" of a sound card.  A sound card in the computer converts digital audio signals into analog audio signals for transmission through the "stereo jack" to the speaker.  (A134, col. 3, ll. 59-61.)

Because the Figure 1 Embodiment uses a sound card, the analog audio signals can be delivered directly to the "analog terminal" of the speaker.  A separate line (the "audio system control connector," element 50 of Figure 1), for transmitting "control signals," runs from the bus of the personal computer to a "digital input terminal" on the speaker unit.  (A134, col. 3, ll. 61-63.)



FIG. 1

For this reason, the patent does *not* describe the Figure 1 Embodiment as having an "interface' (other than a "network interface" which converts digital information from a network's format into digital information the computer can use).  (A134, col. 3, ll. 54-58.)

Figure 2 of the '765 patent (the "Figure 2 Embodiment") represents the first use of "interface," and operates differently than Figure 1.  (A134, col. 3, ll. 64 – col. 4, ll. 8.)  The specification explains that "[t]he elements of FIG. 2 are the same as the elements of FIG. 1, *with some exceptions*."  (A134, col. 3, ll. 66-67 (emphasis added).).  In particular, "[s]ound card 33 of FIG. 1 is not needed in this configuration"; instead, an <u>*interface*</u> (the "interface unit 54" of Figure 2) is inserted

between the computer and the speaker unit.  (A134, col. 3, ll. 67 – col. 4, l. 1.)  The

annotated version of Figure 2, below, shows the addition of the interface unit (54).



The audio and control connections to the computer of Fig. 1 are "replaced"

in Fig. 2 with a "bus interface connector" (52).  (A134, col. 4, ll. 1-4.)  A digital

line connects the "interface unit 54" to the computer bus through the "interface

connector," and the "interface unit" is connected to the "digital terminal" (51) and

the "analog terminal" (49) of the speaker.  (A134, col. 4, ll. 4-8.)

Thus, the specification describes two distinct embodiments.  The Figure 1

Embodiment has no "interface" to couple speaker to computer.  The Figure 2

Embodiment replaces the sound card and control signal connector with a "bus

interface connector" and an "interface unit" allows a speaker requiring an analog

audio signal to produce music originally provided as a digital signal.  The two

different embodiments are shown here:



**First Embodiment**                    **Second Embodiment**

The "interface unit" is described in more detail in Figure 3,[1] in which it

again is shown between the speaker and the computer, but with its internal

components revealed:

---

[1] Although the brief description of drawings for Figure 3 says that the interface unit 54 is present in Figures 1 and 2, this is not how it is described in the detailed description, where there is nothing labeled "interface unit" in Figure 1, and the interface unit is actually introduced as a new and different aspect in Figure 2. (A134; col 3, l. 11-12; A134, col 3, l. 64 – col 4, l. 8.)



FIG. 3

As shown, the *interface unit* receives a digital audio signal from the computer system (20) at "interface connector 20 [*sic, 52*]." (A134, col. 4, ll. 15-17.) The logic circuitry (58) within the interface unit passes the digital audio signals to the D/A converter (60), which *converts the digital audio signal to an analog format* for delivery to the speaker. (A134, col. 4, ll. 16-19.) The logic circuitry also passes the digital control signals to the speaker's control circuitry (16). (A134, col. 4, ll. 20-23.) In addition to Figs. 2 and 3, six drawing sheets of electronic circuit diagrams (Figs. 10A-10F) are devoted to the "interface unit," which obviously is much more than just a connector. (A134, col. 3, ll. 26-27; col. 11, ll. 49-50.)

In the '765 patent's specification, *all* references to this "interface" refer to the Figure 2 Embodiment, where it is needed to convert a digital music signal to an

analog signal suitable for amplification by a powered speaker. There is no reference to any such "interface" between the audio source and the sound reproduction device in the Figure 1 Embodiment. Indeed, nothing in the '765 patent refers to anything in the Figure 1 Embodiment as an "interface," "interface unit," "interface module," or any other type of "interface" between the personal computer and the speaker unit.[2]

While Bose tries to argue that an "interface" does not require D/A conversion by identifying other uses of the word "interface" in the specification, those other types of interfaces share the same key characteristic—conversion of one type of information to another. (Bose Br., at 16-17.) The "interface" at issue includes a D/A converter interface because the conversion it is performing is from a digital audio signal to an analog audio signal.

According to Bose, "*[a]lthough not identified as such in the patent*, the system in Figure 1 has an interface for operatively coupling the sound reproduction device to the computer" because "[t]he interface *can be viewed* as terminals 49 and 51 (the DIN connector) along with the processor circuitry in the sound reproduction device, the combination of which facilitates the exchange of digital

---

[2] Both embodiments have a "network interface card," which has an entirely different location and function than the "interface" of the Figure 2 embodiment. (*See* A134, col. 3, ll. 54-58.) In addition, the claims and specification of the '765 patent refer variously to a "user interface" (*e.g.*, A136, col. 8, ll. 41-44) or to an "interface screen" (*e.g.*, A137, col. 10, ll. 52-64), which convert information in the computer to information readable by a human on a computer screen.

control signals and audio between the devices." (Bose Br., at 15 (emphasis added).) Bose's analysis is *completely backwards*. Bose fabricates a definition for its infringement case, and then purports to find it in the specification where it admittedly is not "not identified as such," instead of using the ample intrinsic evidence to define the term. (*Id.*) Bose's claim that the Figure 1 Embodiment has an "interface" is false and contrary to the intrinsic evidence.

## III.    UNIT, DEVICE, AND MODULE

The specification describes three "implementation arrangements" for the "interface" of the Figure 2 embodiment: a "module" in the computer system, implemented as a circuit board plugged into an expansion slot in the computer, an "intermediate separate unit," such as that shown in Figs. 2 and 3, and as "a module, such as a circuit board" in the speaker unit. (A134, col. 4, l. 60 – col. 5, l. 16.) In each case, it is readily apparent that the unit/device/module is a (single) structure that includes the interface.

## IV.    THE PROSECUTION HISTORY OF THE '765 PATENT

The prosecution history confirms the district court's construction of interface. Bose attempted to obtain broad independent claims that were not limited to the narrower Figure 2 Embodiment, introducing the "interface" claim language in dependent claims. In the face of prior art rejections, Bose ultimately made

14

amendments limiting *all* claims to the Figure 2 Embodiment by adding the "interface" limitations that now appear in the '765 patent.

In the original application for the '765 patent, Bose distinguished between a "connector" and an "interface" in the claims, as originally filed claim 1 included a "connector" for connecting the speaker and the computer:

> 1.    An audio system comprising,
>
> . . . . ,
>
> a *connector* for connecting said sound reproduction device with a computer, . . .

(A184 (emphasis added).)

Original claim 2, a dependent claim, further claimed an "interface device," and specifically stated that the interface device is "for connecting said computer and said connector" and requires a "digital to analog converter":

> 2.    An audio system in accordance with claim 1, and further comprising, an *interface device for connecting said computer and said connector*, said interface device comprising a digital to analog converter.

*Id.* (emphasis added).  These two claims confirm that the "interface" is more than a "connector" or generic "circuitry."  Instead, the "interface" includes a digital to analog converter.

On March 7, 2006—prior to examination and long after the commercial failure of its Wave/PC product and Apple's introduction of the iPod—Bose

15

cancelled all of its original claims, 1-43, as well as added claims 44-79, and introduced new claims 80-104.  (A252-60.)

Claim 80—which eventually became claim 1 of the '765 patent—initially lacked the "interface" limitation.  (*Id.* at 2.)  Following an Office Action (A261-71) and interview (*see* A288-89), Bose added the "interface" limitation to overcome an Examiner rejection based on a prior art patent to Contois, adding the underlined language, among other amendments:

> 80. (currently amended)  An audio reproduction system comprising
> (i) <u>an audio source device comprising . . .</u>;
> (ii) <u>an enclosure compromising:</u>
>  <u>a powered speaker;</u>
> <u>an *interface* configured to operably couple the audio source device with the powered speaker; and</u>
>  <u>control circuitry for receiving control signals; and . . . .</u>

(A274 (italics added).)  In making that amendment, Bose argued that the "interface" and "the first control signal is received by the control circuitry and transmitted to the interface" were "limitations not disclosed or suggested in Contois."  (A282-83.)

In the same Amendment—and to secure allowance—Bose amended *all* of the claims to add the "interface" limitations. (A273-287, at 4, 8, 9.)  Bose's actions during prosecution confirm that the term "interface" is more than a "connector" or

"circuitry that receives an audio signal from an audio source and transmits digital control commands."

## V.    THE PROSECUTION HISTORY OF THE CONTINUATIONS OF THE '765 PATENT

U.S. Patent Application Serial No. 11/608,034 (the "'034 application"), now issued as U.S. Patent No. 8,364,295, was a continuation of the '765 patent.  Bose withdrew the patent from issue during the litigation and filed an amendment that canceled all of the then-pending claims and added new claims 143-218.  (A3699-3705.)  It is evident from a comparison of the new and old claims that a primary motivating factor in the amendment was to remove the term "interface" from the pending claims, and to replace it with the term "connector."[3]  This substitution can be appreciated from the following excerpts:

Old Claim 68:  "an <u>interface</u> located at least partially within the housing that is configured to provide a physical and electrical connection exclusively between the sound reproduction device and a separate audio source device having stored digital music files"

New Claim 169:  "a <u>connector</u> located at least partially within the housing that is configured to provide a physical and electrical connection exclusively between the sound reproduction device and the audio source device"

---

[3] Bose's prosecution practice is to cancel claims and replace them with entirely new claims, rather than make amendments, in order to leave as little evidence in the file history as possible.

The fact that Bose has replaced claim 68 with virtually identical claim 169, and replaced the term "interface" with the term "connector," provides further intrinsic evidence that Bose's proposed construction of "interface," which equates with "connector," is incorrect.

## VI.   DISTRICT COURT'S CLAIM CONSTRUCTION

The district court did not reject Bose's proposed construction of "a connection" as "too simplistic," as Bose suggests, but because it was inconsistent with the specification.  Bose's proposed definition failed to capture the conversion that the "interface"—which, again, only exists in the Figure 2 Embodiment—implements due to the fact that the computer outputs a digital signal in that arrangement.  Bose is correct that that district court's construction excludes the Figure 1 Embodiment, but fails in its brief to explain why it should be included.[4] In any event, the construction is appropriate, particularly where narrowing amendments were made during prosecution and the specification demands that construction.

With respect to the terms "interface unit," "interface device," and "interface module," Bose proposed that each be construed to mean "a connection."  (A3661.) The Defendants proposed "a discrete structure that includes the interface."

---

[4] Given the extensive briefing on this issue and the clear holding the district court below, Defendants submit that permitting Bose to argue this issue for the first time in reply would be improper.

18

(A3661.)  The Court held that the terms should be construed to mean "a structure that includes the interface."  (A86.)

## VII.  THE ACCUSED PRODUCTS

The products Bose accused of infringement below are generically referred to as docking speaker systems.  In all, Bose accused twelve dozen of Appellees' products of infringement, each one having the capability to connect to an Apple "iDevice" (an Apple iPod®, iPhone®, or iPad®) for the purpose of reproducing audio.  One hundred forty-three of the one hundred forty-four accused products— and every product of Appellees Imation and DPI—are speakers with a "30-pin connector" that can receive an iDevice (collectively, the "Common Products").  One SDI product (the "iW1") can connect to an iDevice wirelessly or through a 30 pin connector.  The Common Products were accused of infringing independent claims 35 and 37 and dependent claims 38-42.  The SDI iW1 was accused of infringing independent claims 1 and 37, and various dependent claims.

## VIII.  AT NO TIME DID ANY DEFENDANT POSSESS THE SPECIFIC INTENT TO INFRINGE THE '765 PATENT

The basic facts surrounding Appellees' state of mind concerning the '765 patent are undisputed.

### A.    SDI

After receiving a cease and desist letter, SDI met with Bose.  (A58; A4755.) At that meeting, SDI identified U.S. Patent No. 6,026,150 (the "Frank patent").

19

(A58; A4755-56.)  SDI explained that the Frank patent, coupled with other prior art, invalidated the claims of the '765 patent.[5]  (A58-59; A4755-56.)  When the meeting did not resolve the dispute, SDI commissioned and received a written validity opinion from George E. Oram, Jr., Esq. of Arent Fox LLP, dated May 22, 2009.  (A59; A4756.)  Mr. Oram opined that all of the asserted claims of the '765 patent were invalid based on the combination of the Frank patent and U.S. Patent No. 6,563,769 (the "Van Der Muelen patent").  (A59; A4756.)  Marcos Zalta, SDI's in-house counsel, received Mr. Oram's opinion and reviewed it. (A4762; A5233-34.)  SDI relies on Mr. Zalta to take appropriate action in response to opinion letters.  (A5233-34.)  Mr. Zalta communicated Mr. Oram's conclusions to SDI business executives, who were given an opportunity to review the opinion.  (*Id.*)  The same prior art relied on in Mr. Oram's opinion (the Frank patent and the Van Der Muelen patent) were relied on in the *inter partes* reexamination filing (A59; A4756-57) and, at the time of the summary judgment decision, all claims of the '765 patent stood rejected by the PTO based on that prior art (among others), a fact noted by the district court.  (A46-47; A55; A4744-45.)

---

[5] Bose argued before the District Court that this evidence was inadmissible because the meeting concerned settlement negotiations.  (*See* A4755-56.)  The District Court concluded (correctly) that the Federal Rules of Evidence do not exclude the fact of the disclosure (A71) and Bose does not argue this issue on appeal.

### B.    Imation

Imation received notice of the patent in a December 16, 2008 letter from Bose.  (A56; A4746.)  Following discussions concerning the letter, Imation's inside counsel made an inquiry into the allegations, concluding: (1) "if Bose was interpreting the claims broadly enough to cover a remote control used with an iPod docking station, then the claims must be invalid because there must be prior art that shows something similar before the filing date of the Bose patent or priority date," or (2) to interpret the claims to be valid, it would only cover a PC (and not an iPod) with a stereo.  (A56-57; A4746-48.)  Imation also contacted outside counsel.  (A57; A4748.)  Outside counsel initially provided an oral opinion that the '765 patent was invalid because it "lacked proper written description for the claims as Bose was attempting to assert them against Imation, and therefore, that the claims were either invalid . . . or, if interpreted in a way to be valid," the claims were so narrow in scope that Imation did not infringe.  (A57; A4748.)  Outside counsel issued a written opinion, further explaining his opinion. (A57; A4749.)

After Bose filed suit, Imation discussed the lawsuit with Matthew Himich. (A4750.)  Mr. Himich had already been retained by Defendant DPI at that time. (A4753.)  Mr. Himich informed Imation of his independent opinion that the '765 patent was invalid.  (A4750.)  On November 12, 2009, Mr. Himich filed with the

PTO a request for reexamination concerning of every claim of the patent based the Frank and Van Der Muelen patents (and other prior art as well). (A4742.) Mr. Himich shared this reexamination request with Imation. (A4743.) Imation relied on those opinions.

The PTO rejected all claims of the '765 patent despite multiple briefs filed by Bose. (A4743-45.) During the course of the reexamination, Imation was made aware of the current status of the reexamination and the filings therein. (A4743-45.) These filings include the PTO's conclusions with respect to the '765 patent's invalidity. (A4743-45.) The PTO's repeated rejection of all claims of the '765 patent in reexamination bolsters and confirms the beliefs formed by Imation concerning invalidity, formed initially in reliance on the opinions of Mr. Fitzgerald and then Mr. Himich. (A4743-45; 4750.)

## C.    DPI

DPI first became aware of the '765 patent in early 2009, following a cease and desist letter from Bose. (A57; A4751.) Shortly thereafter, DPI's President and a DPI engineer reviewed Bose's infringement claim, concluding that DPI's products did not infringe the because the patent's computer could not include an iDevice. (A57-58; A4751-52.) At that time, DPI's president stated "I sure did not see how their patent was in any way infringed by our products. I am glad you confer [*sic*] with my thinking." (A57-58; A4752.) Later, Bose informed DPI that

22

"they are claiming that the iPod is the computer." (A57-58; A4752.) DPI's President stated this argument was "a far stretch" and "a ridiculous stretch" but continued his investigation with the engineer. (A4752-53.) The engineer analyzed Bose's new allegation and concluded DPI did not infringe. (A58; A4753.)

After Bose filed suit, DPI retained Mr. Himich. (A4753-54.) After review, Mr. Himich gave DPI's President an oral opinion that the patent is invalid. (A4754.) As described above in relation to Imation, Mr. Himich filed a request for reexamination of all the claims of the '765 patent. (A4742.) The PTO agreed with Mr. Himich's conclusions. (A4742-45.) DPI was informed about events in the reexamination proceeding. (A4742-45.) DPI relied on Mr. Himich's opinions, and the rejection of the claims by the PTO in the reexamination. (A4754.)

## SUMMARY OF ARGUMENT

The district court properly granted Appellees' motion for summary judgment of non-infringement because it was compelled by the court's correct constructions of "interface" and "unit"/"device"/"module," the former of which Bose can contest only by trying to rewrite the specification, and the latter of which Bose claims to *not* dispute.

The Court's construction of "interface" is consistent with the ordinary meaning of that term in the art—something that allows systems using different protocols or formats to communicate—while Bose's proposal seeks to strip it of its essence. The specification confirms that the district court was correct because the embodiment that requires conversion has an "interface," while the embodiment that does not require conversion does not. The only reason the interface exists in the specification is to convert a digital audio signal produced by the computer into an analog signal that can be reproduced by the speaker.

The court's construction of "interface" is also confirmed by the prosecution history, in which Bose, seeking to avoid prior art, amended the claims to cover only the embodiment needing conversion. In the prosecution of continuing applications, Bose removed the "interface" in an effort to claim the embodiment that does not require conversion.

In a desperate effort to lend credibility to its cause, Bose continues to maintain that the '765 patent covers its "SoundDock" products, which did not exist until years after it filed the application for the '765 patent. Like the accused products, however, the SoundDock products do not have an "interface" and are not covered by the patent. Bose actually filed the application to protect a failed product, the "Wave/PC," which was a Bose Wave Radio that could be connected to a computer. Bose intimates without support that the SoundDock was a follow on product. It was not.

Rather, when Apple launched the iPod, Bose tried to rewrite its claims to cover this later-developed technology. That the patent was not originally intended to cover this is beyond dispute. Bose erred in its efforts, however, writing claims to cover only the embodiment shown in Figure 2 of the patent, which is a system in which the computer outputs a *digital* audio signal that is then converted, by an "interface," into an *analog* signal for reproduction by the speaker. All of the Common Products accused in this case operate differently, as they are configured to work with an MP3 player that outputs an *analog* signal, rendering interface conversion unnecessary.

With respect to "unit," "device," and "module," Bose is foreclosed from disputing the district court's construction because (a) Bose sought a different construction before the district court than it seeks on appeal, and (b) Bose purports

to now "agree" with the district court.  This Court should reject Bose's attempts to reargue this construction now given the waiver and its ostensible agreement with the district court.  But even if Bose is permitted to argue those issues again, it cannot succeed because its new interpretation is unsupported in specification, would render these terms superfluous, and would violate the doctrine of claim differentiation.

With respect to the intent issue, the district court correctly concluded that Bose failed to adduce a material issue of fact.  There is not a wisp of evidence that any Defendant possessed the requisite intent to be found liable for indirect infringement.  Bose's failure to present a material issue of fact on intent is an alternative ground for affirmance as to SDI and the other Defendants for *every* accused product.

Finally, Bose's assertion that it should be permitted a trial on infringement and validity even assuming the Defendants were acting in good faith should be rejected because it was not presented below.  Bose chose to immediately appeal its summary judgment loss on 143 of the 144 accused products based on claim construction, rather than pursue any alleged "future infringement" based on the remaining one product.  Because Bose did not request that the trial court proceed with a validity and infringement trial on the iW1 product, either before, during, or

after the summary judgment decision, or in its request for entry of judgment filed months later, it has waived the right to ask this Court for that remedy.

# ARGUMENT

## I.    STANDARD OF REVIEW

Appellees agree that claim construction is a question of law to be reviewed *de novo,* that the district court's grant of summary judgment is likewise reviewed *de novo*, and that the district court's denial of Bose's motion for reconsideration is reviewed under First Circuit law and an abuse of discretion standard.

## II.    LEGAL PRINCIPLES

Claim construction is an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  Claim construction involves considering "words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Phillips*, 415 F.3d at 1314.

The "claims must be read in view of the specification."  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979).  The specification "is always highly relevant to the claim construction analysis" and, "[u]sually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  The specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim

to be ascertained from the words alone." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  And "the specification may reveal a special definition given a claim term by the patentee that differs from the meaning it would otherwise possess," in which case the special definition governs.  *Id.* at 1314.  Special definitions need not be explicit.  *See Novartis Pharms. v. Abbott Labs.*, 375 F.3d 1328, 1334-35 (Fed. Cir. 2004).

The intrinsic evidence also includes the prosecution history.  *Phillips*, 415 F.3d at 1317.  The prosecution history is significant because it "excludes any interpretation that was disclaimed during prosecution."  *Id.*  Furthermore, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention."  *Id.*

Finally, "extrinsic evidence may be useful," because it "can help educate the court," but it "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."  *Id.* at 1319.  In fact, a court should "discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent."  *Id.* at 1318 (internal quotations omitted).

Following construction of the meaning and scope of the patent claims, the court must compare the properly construed claims to the accused device.

*Markman*, 52 F.3d at 976.  "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law."  *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1253 (Fed. Cir. 2010) (internal citations omitted).  In this case, the district court's claim construction is dispositive of infringement.

## III.    THE DISTRICT COURT CORRECTLY CONSTRUED THE TERM "INTERFACE."

The evidence that the claimed "interface" is more than the definition urged by Bose is overwhelming.

### A.    The District Court's Construction is Consistent with the Plain Meaning of "Interface".

Bose begins by asserting that "the plain meaning of claim language ordinarily controls unless the patentee provides a special definition for a claim term or disavows the ordinary scope of a claim term either in the specification or during prosecution."  (Bose Br., at 29.)  But "ordinary meaning" is not to be viewed in a vacuum.  "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent."  *Phillips*, 415 F.3d at 1321.  The construction adopted by the district court is consistent with the ordinary understanding of the term "interface" in the context of the invention described and claimed in the 765 patent, while Bose's proposed definition deprives the term of its core meaning.

Dictionaries cited by Bose demonstrate that the term "interface"—as used in the '765 patent—may have one of a couple of ordinary meanings, including:

• "A concept involving the specification of the interconnection between two equipments or systems," which "*includes the type quantity, and function of the interconnection circuits and the type and form of signals to be interchanged by these circuits.*" (A85; A3098.)

• "A common boundary between automatic data processing systems or parts of a single system. *In communications and data systems, it may involve code, format, speed, or other changes as required.*" (A85-86; A3105.)

Centrally, an "interface" effects communication between different systems (such as the computer and speaker of the '765 patent), by adjusting the type or format of the signal or data being communicated. This is consistent with the district court's definition, in which the "interface" converts a digital signal to an analog signal. These dictionary definitions are also inconsistent Bose's constructions, both of which strip all "interfacing" out of the term "interface."

As explained above, the '765 patent describes the use of an "interface" *only* in the embodiment in which a computer is outputting a *digital* signal to a speaker requiring an *analog* signal. Thus, in the context of the patent's specification, the

"interfacing" is the conversion of the computer's digital audio signal to an analog audio signal reproducible by the speaker (and the transfer of control signals).

### B.    The District Court Correctly Read the Claims in Light of the Specification.

The district court properly began by reading the claims in light of the specification to discern their meaning.  *See Phillips,* 415 F.3d at 1315 (explaining that "[u]sually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term").  This Court frequently approves claim constructions informed by the specification.  *See, e.g., Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008) (construing "flow restrictor" to mean "a structure that serves to restrict the rate of flow sufficiently to prevent a hazardous situation" due to "the specification's consistent emphasis on this fundamental feature of the invention").  Similarly, the specification explains that the role of the "interface" is to convert a computer-generated digital audio signal into an analog audio signal for reproduction by the speaker and to communicate control signals.  In all embodiments, the speaker is configured to receive only an analog audio signal. Because the computer in the Figure 1 Embodiment produces an analog audio signal, no interface is required or described.

But in the Figure 2 Embodiment, in which the computer is producing a digital signal, that digital signal must be converted—by the "interface" —into analog format.  (*See* A134, col. 3, ll. 67 – col. 4, l. 1 ("Sound card 33 of FIG. 1 is

not needed in this configuration.  Stereo jack 48 and the audio system control

connector 50 of FIG. 1 are replaced by a bus interface connector 52, which

connects to an interface unit 54.  The interface unit 54 connects to audio signal

processing circuitry 14 through analog terminal 49 and to control electronics

circuitry 16 through digital terminal 51.")  A correct reading of the specification

leads one directly to the district court's construction.

### C.    These Claims Do Not, And Do Not Have To, Cover the Figure 1 Embodiment.

In *August Tech. Corp. v. Camek, Ltd.*, the patentee argued, as Bose does, that

the defendant's construction improperly excluded a "preferred embodiment."  655

F.3d 1278, 1285 (Fed. Cir. 2011).  The court disagreed, noting that "[t]he mere fact

that there is an alternative embodiment . . . that is not encompassed by [the] claim

construction does not outweigh the language of the claim, especially when the

court's construction is supported by the intrinsic evidence."  *Id*. (quoting *TIP Sys.,

LLC v. Phillips & Brooks/Gladwin, Inc*., 529 F.3d 1364, 1373 (Fed. Cir. 2008)).

Here, the "interface" claims of the '765 patent are directed to the Figure 2

Embodiment, which is specifically described as having an "interface."  Bose's

argument that the district court's construction is wrong because it would mean that

no claim would cover the Figure 1 Embodiment must fail because it is entirely

proper to exclude an embodiment that is not encompassed by the claim language.

*See, e.g. Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138

(Fed. Cir. 2007).  Bose *elected* to amend its claims to limit them to the Figure 2

Embodiment and must live with that choice.

### D. The Prosecution History of the '765 Patent Confirms the District Court's Interpretation.

The prosecution history confirms the district court's construction of

"interface."  Bose initially sought broad independent claims that were not drawn

specifically to the Figure 2 Embodiment, and the "interface" claim language was

introduced only in a dependent claim.

In the face of prior art rejections, however, Bose added the "interface"

elements that now appear in the '765 patent's independent claims, limiting all

claims to the second (i.e., Figures 2 and 3) embodiment.  According to Bose,

original claims 1 and 2 are not relevant to this inquiry because "Bose voluntarily

canceled all those claims and presented a broader set for substantive examination."

(Bose Br., at 37.)  That misses the point.  The clear distinction between the

"connector" of original claim 1 and the "interface" of original claim 2

demonstrates the difference between the district court's correct definition and

Bose's hollow proposals.

Instead of the phrase "said interface device comprising a digital to analog

converter" constituting an *additional* limitation on the term "interface device," it is

a definitional statement (*i.e.,* that an interface device includes at least a digital to

analog converter).  (*Id*.; A83-84.)  Bose's argument ignores the structure of

original claim 1 and 2.  Each original claim containing "interface device" (claims 2 and 9) was a dependent claim, contained the digital to analog converter language, and had no further dependent claims.  (A184; A186; A141-199.)  Each related independent claim (claims 1 and 8) used "connector."  (A184; A185; A141-199.)  For Bose's argument to make sense, "interface device" and "said interface device comprising . . ." would need to be present in two *different* claims.  They are not, and "said interface device comprising . . ." defines (in part) what the "interface device" possesses—a digital to analog converter, as correctly analyzed by the district court.

With respect to the Contois and Katz references, Bose argues that it "used the added remote control, and not the interface limitation, as the basis by which it distinguished amended claim 80 from that art."  (Bose Br., at 39.)  That is not true.  In response to the Contois/Katz rejection, Bose amended the claims to add *both* the "remote" *and* the "interface" limitations.  (A274.)  Bose then argued *both* the interface *and* the remote as distinguishing the amended claim over the prior art.  (A282-83 (arguing the "interface" and that "the first control signal is received by the control circuitry and transmitted to the interface" as "limitations not disclosed or suggested in Contois").)

The amendment and argument belie Bose's position, as both the remote and the interface were added and argued at the same time.  Bose did not simply

"define[] functions of the interface via the amendment" (Bose Br. at 39), it added

that entire "interface" claim element in response to the prior art rejection.

With respect to the Kataoka reference, Bose again misdescribes the

prosecution history. The "connection interface 201" that the Examiner equated

with the claimed interface is an "interface of IEEE1394."[6] (A3006; A293-94;

A1839, col. 13, ll. 24-29.) IEEE1394 is an "interface" in the same sense as the

term is used in the '765 patent, translating between, for example, digital cameras

and computers. This explains why the examiner (employing the "broadest

reasonable interpretation consistent with the specification") would have made the

rejection. *See Phillips*, 415 F.3d at 1316. That the examiner equated the claimed

"interface" with a FireWire interface only confirms that an "interface" effects

communication between different systems (such as the computer and speaker of

the '765 patent), by adjusting the type or format of the signal or data being

communicated.

### E.    Subsequent Prosecution History Confirms the District Court's Interpretation.

Changes to continuation applications made by Bose during this litigation

also support the district court's claim construction. *See CVI/Beta Ventures, Inc. v.*

---

[6] The IEEE1394 standard describes a computer hardware and software protocol (*i.e.*, systems and circuits—not just a connector) known as "FireWire," which allows different devices (computers, digital cameras, etc.) to communicate. (A3476-93.)

*Tura LP*, 112 F.3d 1146, 1158-59 (Fed. Cir. 1997). After the Defendants identified the "interface" non-infringement argument in the litigation below, Bose tried to fix that problem in its continuing applications, substituting the term "connector" for every appearance of the term "interface" in both continuation applications. (Compare A3675 ("an *interface* located at least partially within the housing") *with* A3689 ("a *connector* located at least partially within the housing").) Bose's wholesale substitution of "connector" for "interface" in the continuing application confirms, beyond any doubt, that the "interface" claimed in the '765 patent is not simply a connector (or the wordier, but indistinguishable, "circuitry that receives an audio signal from an audio source and transmits digital control commands").

### F. The District Court's Construction is Confirmed by the Extrinsic Evidence.

The district court's construction of "interface" is also fully consistent with the extrinsic evidence.

#### 1. Dictionary Definitions

The most pertinent "extrinsic evidence" is the dictionary definitions, which, as described above, are fully consistent with the definition adopted by the district court. *See supra, at 31.*

#### 2. The Wave/PC Product

In its brief, Bose refers to a failed Bose product called the "Wave/PC," which was a Wave radio that connected to a computer. A manual for the Wave/PC

was submitted with the application on a CD-ROM.  (A138, col. 11, ll. 51-52; A200-28.)

The Wave/PC did not include an interface (because it was designed to work with a computer with a sound card), but *Bose was separately selling the actual "interface" itself*, to be employed where the user did not have, or did not want to use, a sound card in the computer.

Figure 2 of the User Manual for Bose's "Wave/PC Interactive System USB Adapter Kit" (A3464-75) shows the USB Adapter (i.e., *the interface*), encircled in blue below, installed between the computer and the Wave radio:



(A3468.)  The manual explains that the USB Adapter was for use in "bypassing your computer's sound card and enjoying full digital audio" (A3467), which is consistent with the Fig. 1/Fig. 2 distinction described above.  *See supra, at* 8-14.

That interface is also described in development documents that Bose attached as exhibits in opposition to Defendants' invalidity summary judgment motion. Those documents explain that the basic version of the Wave/PC would use analog audio, as in Figure 1 of the patent, but also describe "an optional cable with integrated electronics," that would be "located within an inline 'dongle,'" where "[t]he dongle will contain a USB audio codec (stereo A/D and D/A) and a USB to serial converter," and would "convert a digital audio stream to analog," as in Figure 2 of the patent. (A1990.) The documents clearly show that the dongle was used to perform digital-to-analog conversion. (A2144 ("the device will convert a digital audio stream to analog").)

Of particular note is the fact that the title block of the original version of Fig. 10 in the patent application (A2344) describes the subject of the drawing as "PC BOARD USB DONGLE":



This proves that Fig. 10—what the specification calls the "interface unit"—is the digital-to-analog converting circuit board for the "USB Dongle," which is the Wave/PC USB Adapter shown in the manual and described in the development documents.

This all demonstrates that Fig. 1 of the '765 patent (which has no "interface," according to the specification) corresponds to the Wave/PC with the standard cable, while Fig. 2 of the patent (which the specification says has an "interface") corresponds to the figure from the Wave/PC USB Adapter manual:



The help files referenced by Bose are irrelevant because they only describe the Figure 1 Embodiment. A computer only has a "audio output jack" when it has a sound card to produce the audio; the patent explains that the stereo jack is not used in the embodiment that has the interface instead of the sound card. (A134, col. 4, ll. 1-4.)

### 3.    Inventor Testimony

While Bose briefly refers to "inventor testimony" in its brief, it fails to observe that this inventor, Mr. Beckmann, was a hired expert for Bose in the litigation and that he submitted an expert report on validity. (A1868-1909.) This type of extrinsic evidence is entitled to little or, more appropriately, to no weight as to the meaning of claim terms. *See, e.g. Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346-47 (Fed. Cir. 2008).

### 4.    Reexamination

The reexamination is also of little moment, because the standards for claim construction are completely different. *See In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984) ("The PTO broadly interprets claims during examination of a patent application since the applicant may 'amend his claims to obtain protection commensurate with his actual contribution to the art.'"). The Patent Office is applying the "broadest reasonable construction consistent with the specification," while the courts are charged with construing the claims as they would have been

understood by one of skill in the art at the time of the invention. *Compare In re Am. Acad. Of Sci. Tech Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004) (discussing the Patent Office's standard) *with Phillips*, 415 F.3d at 1316 (discussing claim construction by the district courts).

### 5.    Imation Opinion

Finally, it is unclear how an opinion written by outside counsel for Appellee Imation, well after the patent issued, could possibly be relevant to the meaning of the term "interface" in the specification in 1997. In any event, the excerpt that Bose quotes from the Imation opinion is about where the interface is located, not what it is, and therefore has no bearing on whether the interface performs the conversion. (Bose Br., at 40-41.)

### G.    The District Court's Construction is Consistent with the Claims.

Bose's argument that "the claim language supports a broader construction" is irrelevant. There is nothing about inclusion of the conversion that is at odds with any other part of the claims in which these terms appear, and Bose does not claim otherwise. Instead, Bose points to dependent claims 24 and 29. As explained below, these provide no support for Bose's position.

### 1.    Claim 24 Does Not Support Bose's Argument.

Claim 24 depends from claim 1 of the '765 patent and reads as follows:

24. The audio reproduction system of claim 1, wherein the audio source device is configured to transmit an [*sic*] analog representations

of the respective music files to the sound reproduction device via the interface.

According to Bose, in this claim "the audio source must include a D/A converter so that it can transmit an analog form of the music files to the speaker in the system via the interface, and there is no need for the interface to include another D/A converter."  (Bose Br., at 31.)

The first, and most glaring, problem with this analysis is that claim 24 describes transmission of analog representations to "the sound reproduction device," but *the system of claim 1, from which claim 24 depends, does not have a "sound reproduction device."*  Claim 24 is a fatally defective mistake, on its face, and thus cannot support Plaintiff's argument.

Second, Bose misinterprets this claim in an attempt to conjure up a conflict. The claim states that the audio source is configured to transmit analog representations of the music to the speaker "via the interface," as one can, for example, send a letter to a Chinese speaker "via" a translation service which receives it in English and translates it to Chinese.  Here, "via" simply means that the computer and the interface provide the necessary analog signal at the speaker. The claim says nothing about the audio signal being in analog form *when it gets to the interface*.

In fact, the prosecution history proves conclusively that Bose's analysis is incorrect.  Claim 24 was added as application claim 132 after claim 1 (which then

43

was application claim 80) had been allowed. (A303-13.) When adding claim 132, Bose told the Examiner that support for the claim was found at page 9, lines 10-12 of the application (A165), which corresponds to col. 3, ll. 32-48 of the issued patent, describes Fig. 3 and, specifically, the internal workings ("D/A converter 60") of the "interface unit 54" of Fig. 2, which the specification explains is used to convert a digital signal to analog.

Thus, the very portion of the specification that Bose said supports claim 24 explains how the *digital* audio signal *from the computer* is sent to a separate interface unit, which performs D/A conversion to change it into an analog signal to be reproduced by the speaker: "[i]f [the] signals are audio information, logic circuitry transmits signals to D/A converter 60 which converts the digital signal to an analog audio signal."

This proves that the district court's construction of "interface" is correct, and that Bose's is not. *If added claim 24 finds support in the specification*, it can only mean that the computer is configured to work with the interface to send analog signals to the speaker, *i.e.*, that the computer delivers a digital signal to the interface, which converts it to an analog representation for reproduction by the speaker. This is what the applicant pointed to in the application when adding this claim. If claim 24 means something else, it must be invalid (because it is not

44

supported by the application and it was added six years into the prosecution), and it certainly cannot be relied upon by Bose to argue claim construction.

Thus, either claim 24 and the associated prosecution history support the district court, or added claim 24 is erroneous and invalid, and, therefore, immaterial.

### 2.    Claim 29 Does Not Support Bose's Argument.

According to Bose, this claim 29 describes a system "where the audio source includes a D/A converter," meaning that the interface of the independent claim need not have such circuitry. (Bose Br., at 31-32.) In fact, claim 29 says nothing like that, as it simply recites that "the music storage device comprises circuitry for converting a music file to audible sound."

This claim supports Appellees' construction as much as it supports Bose's because the "music storage device" inarguably does not produce the "audible sound"—that is the job of the "sound reproduction device." This means that this claim is either fatally defective or that any "circuitry" in the *music storage device* is only performing *part* of the work of turning the music file on the computer into sound for the speaker, and there is no reason to believe that the "circuitry" is performing the D/A conversion, as opposed to some other part of the process of moving the music from the hard drive in the computer to the separate speaker.

The "circuitry" of claim 29 could just as easily be the circuitry that connects the hard drive to the computer bus, the bus itself, or the circuitry that ties the processor to the bus.  The patent is silent on this (other than expressly explaining that the "interface unit" does the D/A conversion).[7]

More importantly, this "circuitry" plainly does not include the D/A conversion, because the specification expressly describes, in connection with Figs. 2 and 3, how the "interface unit 52" performs the D/A conversion, and claim 25, from which claim 29 depends, includes that very same "interface unit."  Again, this argument contrary to both the specification and the claims.

Finally, the prosecution history also proves that this argument is incorrect. Claim 29 was originally added (again, long after the application had been filed) as application claim 98.  When claim 98 was added, however, it read as follows: "The audio reproduction device of claim 94 wherein the *sound reproduction device* [*not the music storage device*] comprises circuitry for converting a music file to audible sound."  (*See* A253-60, at 5.)  This made sense, because the "sound reproduction device" is a speaker, which actually would produce "audible sound." But this also confirms that this "circuitry" is *not* a D/A converter, as Bose claims,

---

[7] For his part, the Examiner attributed no special meaning to this language, noting that "it is inherent that there will be circuitry to convert the digital music to audible sound in order to produce an audible output."  (A262-71, at 6.)

because in independent claim 25 the speaker is receiving a music signal that has already been converted from digital to analog by the "interface unit."

## IV.    THE DISTRICT COURT CORRECTLY CONSTRUED UNIT/DEVICE/MODULE.

Bose states that it "does not contest the district court's construction of interface unit/device/module as 'a structure that includes an interface,'" asserting that it "proposed that the parties agree on this construction prior to the Markman hearing."  (Bose Br., at 42.)  In fact, Bose's proposed construction of each of "interface unit," "interface device," and "interface module" was "a connection"— the same as its proposal for "interface" alone.  (A3003-07.)

### A.    Bose Has Waived Any Claim Construction Argument on These Terms.

Having argued for "a connection" below, Bose is foreclosed from seeking a different construction on appeal.  *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1371 (Fed. Cir. 2002) ("Our precedent makes clear that in the context of claim construction, a waiver may occur if a party raises a new issue on appeal, as by, e.g., presenting a new question of claim scope.").  And having now abandoned the argument for "a connection" by not raising it in its brief, Bose is completely barred from challenging the construction of these terms on appeal.

### B.    Even if Not Waived, Bose's Argument is Clearly Wrong.

Even aside from the clear waiver, Bose's argument is frivolous.  Bose claims that it "*does not contest*" the district court's construction of interface unit/device/module as "*a structure* that includes an interface." However, Bose erroneously asserts that the district court "revised" its claim construction when it explained in the summary judgment order that there could be no infringement because "a structure" is "singularly physical."  (Bose Br., at 43.)  That is wrong, as expressly described in the district court's opinion (A10 (not altering its construction and instead explaining that "Bose's understanding [of the Court's original construction] is incorrect")).

Of course "a structure" in a claim construction is a single structure—if not, it would be "structures," "one or more structures," or just "structure," not "*a* structure."  Bose's *concession* that the interface unit, interface device, and interface module are each "a structure that includes an interface" is sufficient to dispose of this issue.

Bose goes on to argue that these terms are "all generic terms for *an* object" that "do not suggest any particular form for *the* object."  (Bose Br., at 43.)  Again, however, even Bose cannot avoid the singular.  "*An* object" and "*the* object" are not multiple objects, as Bose's argument would require.  Bose's problem is that, having *agreed* (including in its opening brief) that unit/device/module is "a

48

structure," it is foreclosed from disputing that. Even if it were true that the specification does not "require[] that the interface be a 'singularly physical' structure," it would be immaterial because Bose has conceded the propriety (as it must) of the "a structure" construction. The time for resort to the specification and the prosecution history has passed.

For the same reason, Bose's discussion of cases about *claim construction*, including *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005); *Textron Innovations Inc. v. Am. Eurocopter Corp.*, 498 Fed.Appx. 23 (Fed. Cir. 2012), *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002), and *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012), is entirely immaterial. Claim construction rules are used to interpret claim terms, not to interpret constructions, which, under Bose's theory, would then be used to interpret construction of constructions, etc. The claim terms have already been construed, and Bose purports to *agree* with the construction that compels a finding of non-infringement.

Were Bose able to challenge this issue now, and were it appropriate to look to the specification now, the district court's interpretation would have to be affirmed anyway. These three terms are inherently singular structures, and they are singular structures in each of the three implementations in specification: a "module" in the computer system, implemented as a circuit board that is plugged

into an expansion slot in the computer; an "intermediate separate unit," such as that shown in Figs. 2 and 3; and "a module, such as a circuit board" in the speaker unit. (A134-35, col. 4, l. 60-col. 5, ll. 11-16.)

Bose argues that "even though the specification depicts an interface unit and related implementations as discrete structures, *e.g.*, a circuit board, Bose did not thereby limit the meaning of the interface unit/device/module terms to this physical form or disavow any claim scope." (Bose Br., at 45.)

A look at the claims, however, confirms that it *is* necessary to limit the unit/device/module claims to the singular structures they describe. This is because claim 1 recites an "interface" that is *not* a unit, device, or module, differentiating that claim from those "interface" claims because it is not limited to a singular structure. (*See* A138, col. 11, ll. 62-67–col. 12, ll. 1-16; A139, col. 13, ll. 33-37; A139, col. 14, ll. 33-40; A140, col. 15, ll. 1-7.) Reading "interface unit," "interface device," and "interface module" to not require a singular structure would render them identical to "interface," violating the doctrine of claim differentiation. *See, e.g. Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987).

### C.    Claim 37 Does Not Support Bose's Argument

Bose also points to claim 37, which states that the "interface module" is "at least partially integrated within the [speaker] enclosure." (A140, col. 15, ll. 5-7.)

According to Bose, this claim "recites a different configuration of the interface than the three exemplary configurations of the interface unit described in the specification" because it has an "an interface module at *least partially integrated within* the enclosure." (Bose Br., at 45 (emphasis added).) The convoluted argument is that "[b]y using the phrase 'at least partially integrated within,' the claim expressly contemplates that part of the interface module may be in another part of the audio system," that "[b]ased on the claim language, one logical place for the rest of the interface module is in the audio source device," such that "Claim 37 thus expressly contemplates that the interface module need not be something "singularly physical," but can be a non-unitary structure." (*Id.* at 45-46)

This contrived argument is plainly incorrect. "At least partially integrated within" is a claim drafting device to avoid non-infringement by a product in which the interface is in the speaker (as in the third implementation—a "module" in the speaker system) but extends partially outside it. Bose's argument that this claim— *which was not original*—describes an entirely new embodiment in which the interface is partially in the speaker and partially in the audio source device is absurd. Even if there was support for an embodiment in which the interface module in the speaker extended partially outside the speaker (and, again, that concept is found only in claim 37, which was added nearly six years after the

application was filed), there is absolutely nothing to place the extending part of it *in the computer*—the idea that the extending part of it somehow gets into the computer is completely fabricated for this appeal.

In any event, even if this argument was not a complete fiction, it is improper for Bose to use it to dispute a claim construction that it is telling this Court it "does not contest."

## V.    UNDER THE CORRECT CONSTRUCTIONS, NO COMMON PRODUCT CAN INFRINGE THE CLAIMS

None of the Common Products can infringe because they do not include the "interface device" (of claim 35) or the "interface module" (of claim 37).  They all lack "a structure that includes the [circuitry that converts a digital audio signal from an audio source to an analog audio signal and transmits digital control commands]."

There is not even arguably "a structure that includes the interface" in the Common Products, because it is not disputed that they do not do any conversion. And even when the Common Products are combined with an iDevice, there is not "*a structure* that includes the interface" because the components that make up what Bose identifies as the interface are located in different devices.  In fact, the Common Products mirror the Figure 1 Embodiment, which, as explained above, is

not covered by the claims that issued in the '765 patent.[8]  Because the Common

Products lack "a structure" that includes the interface, and are indistinguishable

from the Figure 1 Embodiment, the district court did not err in granting summary

judgment of non-infringement.

### A. The District Court's Claim Construction Explicitly Requires *"A Structure"* Lacking From The Common Products.

None of the Common Products have circuitry that converts a digital audio

signal from an audio source to an analog audio signal and transmits digital control

commands.  To avoid the plain effect of the district court's claim construction,

Bose tried to cobble together multiple devices that it could call "a structure,"

arguing that the claimed "interface device" and "interface module" consist of the

following set of separate things (or, in Bose's appeal vernacular, a "non-unitary

structure"):

(A)    circuitry within the accused Common Products, <u>and</u>

(B)    the 30 pin connector on the outside of the Common Products, <u>and</u>

(C)    circuitry within the separate iPod supplied by Defendants' customers.

Bose's expert provided the following diagram to demonstrate the

arrangement:

---

[8] Bose repeatedly argued to the District Court that if it adopted Defendants' construction of the term interface (which it largely did), then the Figure 1 Embodiment would not be covered by any claim of the '765 patent.  (*See, e.g.,* A3708, p. 5 l. 3- p.7 l. 5; A4066.)



In this concept, the interface is not "a structure" because part of it is found in the iDevice and part of it is found in the separate Common Product. As noted by the district court, the specification describes three different "implementation arrangements" of the "interface unit" of the Figure 2 Embodiment, either (a) a "module" in the computer system, (2) an "intermediate, separate unit," or (3) a module in the sound reproduction device. (A134-135, col 4, l. 60 – col.5, l. 16.). For each of the three unit/device/module implementations, there is a single structure, unlike Bose's "non-unitary structure" that is part of the speaker and part of the iPod. While Bose's "non-unitary structure" may constitute an "interface," they cannot also constitute an interface unit/device/module, because the district court correctly concluded that these terms have different meanings. *See, e.g. Tandon,* 831 F.2d at 1023.

**B.    The Common Products Do Not Infringe Because They Operate Similar to the Excluded Figure 1 Embodiment.**

Bose's expert acknowledged that the D/A conversion takes place in the iDevice that can be mated to the Common Products.  The iDevice is thus analogous to the computer in the '765 patent's Figure 1 Embodiment, which included a sound card that converted a digital audio signal to an analog audio signal and then output that signal to the speaker.  Bose's expert also asserted that the control signal transmission of the interface device/module takes place in the Common Products, because they "contain[] 'circuitry that transmits digital control commands' (e.g., Microcontroller)."  But this was also true of the patent's Figure 1 Embodiment, because the speaker received commands from the remote and transmitted them to the computer.  Bose's expert's analysis can easily be overlaid on the diagram of the Figure 1 Embodiment:



Thus, Bose's infringement argument would apply equally to the Figure 1 Embodiment, even though Bose *agreed* with the district court that, under the constructions adopted by the district court, "the current claims no longer cover [the Figure 1] embodiment." (A3708, p. 5 l. 3-p.7 l. 5.)  Because the Common Products lack an interface module or device for the same reasons that the Figure 1 Embodiment lacks an interface (they both pass analog audio signals to an analog speaker without the need for conversion), Bose has acknowledged that they cannot infringe the claims properly construed by the district court.

Since it is undisputed that the "interface" components are not located in "a structure," the district court's finding of summary judgment of noninfringement by the Common Products was correct.

## VI.   SUMMARY JUDGMENT IS ALSO APPROPRIATE CONCERNING INDIRECT INFRINGEMENT.

In order to indirectly infringe the '765 patent, each defendant must have had both knowledge of the patent and the *specific intent to infringe*.  "[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement," *i.e.* a showing that the alleged inducer knew of the patent, induced the infringing acts, *and* possessed a specific intent to encourage another's infringement of the patent.  *Global-Tech v. SEB*, *131* S.Ct. 2060, 2068 (2011)*; see also Vita-Mix Corp. v. Basic Holding, Inc.,* 581 F.3d 1317, 1328 (Fed. Cir. 2009), *citing DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1304 (Fed.

Cir. 2006) (en banc in relevant part).  The same is required for contributory

infringement under Section 271(c).  *See Global-Tech,* 131 S.Ct. at 2064-2068

("the *same knowledge* is needed for induced infringement under § 271(b) as for

35 U.S.C. § 271(c)").

*Global-Tech* makes clear that the knowledge requirement for inducement

and contributory infringement is identical.  *Id*. at 2072 (Kennedy, J.,

dissenting).  Bose conceded the need to demonstrate such intent.  (A6451; ECF

No. 274, at 2:17-20)  A good faith belief that the activity is not protected by any

claim of a valid patent is inconsistent with an intent to infringe.  *See Commil*

*USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1368 (Fed. Cir. 2013).  Bose

failed to present *any* affirmative evidence that SDI, or *any* of the defendants

formed such an intent.  The district court's grant of summary judgment of no

indirect infringement should be affirmed.

### A.    Intent to Infringe Is A Requirement for Both Contributory and Induced Infringement and Absent on this Record.

On the record, there is no issue of material fact that precludes a grant of

summary judgment of no indirect infringement in favor of each defendant. As the

party alleging infringement, *Bose bore the burden of showing that each defendant*

*possessed a specific intent to cause an infringement.  See Vita-Mix,* 581 F.3d at

1328; *see also Global-Tech,* 131 S.Ct. at 2068; *Commil USA*, 720 F.3d at 1366.

Bose was unable to carry its burden, as it failed to adduce any positive evidence

that a single defendant believed that the '765 patent was valid or that their customers infringed any valid claim of the '765 patent. This failure results from a uniform belief by defendants that the '765 patent is *invalid* (a conclusion shared by the Patent Office) and that an invalid patent cannot be infringed. *See, e.g. Commil USA*, 720 F.3d at 1368 (finding that a belief a patent is invalid can negate intent to infringe).

At best, the affirmative evidence presented by Bose demonstrates that defendants continued to sell accused products after receiving notice of the accusation. (Bose Br., p. 56) But there is no logical inconsistency between continued sales of accused products and reliance on one or more invalidity opinions. Certainly, Bose cites to no case law suggesting such a connection – each of the cases cited relate to situations in which there was no opinion, or where opinions were found to be incompetent. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1365 (Fed. Cir. 2006); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1365-66 (Fed. Cir. 2006); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365 (Fed. Cir. 2001).

In *Applied Medical*, the defendant rushed a design around to market in an effort to avoid a permanent injunction. 435 F.3d at 1365. Less than six months after a jury found the patent valid and willfully infringed, and mere days before the redesign launch, defendant obtained a series of opinions, only some of which

were relevant and none of which arrived in time to impact the redesign.  *Id.* at

1358-59.  The opinions obtained in the *Golden Blount* case were found to be

incompetent.  438 F.3d at 1366-67.  An initial "opinion" was based on an

unverified and incorrect assertion of prior use.  *Id.* at 1365.  Subsequent opinions

occurred well after the lawsuit was filed, and were rendered before the attorney

examined the accused device (or in one case, prior to a review of the prosecution

history).  *Id.* at 1366-67.  Here, Bose did not (1) attack the credentials of the

attorneys rendering the opinions, or (2) attack the competency of the legal

opinions obtained.[9]  Instead, Bose posits flimsy theories on how a jury could

disbelieve defendants' testimony that they relied on the opinions of their attorneys,

which were thereafter confirmed by the PTO.  Bose's argument is tantamount to a

*per se* rule that mere knowledge of the patent suffices to overcome a motion for

summary judgment of no indirect infringement.  Liability cannot be premised on

mere knowledge alone.  *See, e.g. Mikkelsen Graphic Eng'g Inc. v. Zund Am., Inc.*,

No. 07-c-391, 2011 WL 6122377 (E.D. Wisc. Dec. 8, 2011) (analyzing *DSU Med.*

*Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006)).

The district court did not hold that an invalidity opinion of counsel and/or a

successful reexamination can never result in indirect infringement, but rather that

---

[9] Nor could it.  The invalidity opinions relied on by the defendants include the
same prior art cited in the *inter partes* reexamination to reject every claim.

Bose failed to carry its burden to offer any evidence to support the specific intent necessary to sustain such claims after full discovery of Defendants and opinion counsel. (A65-66) *See Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553-54 (Fed. Cir. 1990) (reversing finding of inducement to infringe because defendants acted on the "good faith belief, based on advice of counsel, that its products did not infringe."); *Gross Int'l. Am., Inc. v. Graphic Mgmt. Assoc., Inc.,* 739 F. Supp. 2d 1089, 1115-16 (N.D. Ill. 2010) (granting summary judgment of no infringement under 35 U.S.C. § 271(b) based on an absence of intent). *Mikkelsen Graphic Eng'g*, 2011 WL 6122377, at *7-8 (same); *Kolmes v. World Elastic Corp.,* No. 4:93CV00719, 1995 WL 918081, at *10 (M.D.N.C. Sept. 18, 1995) (entering judgment for defendants after a bench trial on plaintiff's inducement claim "where they had consulted counsel and had a good faith belief in the invalidity of the '948 patent, requesting reexamination by the PTO.").

Bose's arguments are nothing more than a combination of distortions of the record and speculation about picayune details to support the claim that a defendant could have formed ill intent.  *See Hoyos v. Telecorp Commc'ns, Inc*., 488 F.3d 1, 5 (1st Cir. 2007) ("The nonmovant may not defeat summary judgment 'by relying on improbable inferences, conclusory allegations, or rank speculation.'") (*quoting Ingram v. Brink's, Inc*., 414 F.3d 222, 228–29 (1st Cir. 2005).

Bose had the burden of proof and was required to present affirmative evidence.  *See, e.g. Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986).  It did not do so.

## B.    The District Court Correctly Determined That SDI Lacked The Necessary Intent to Indirectly Infringe the '765 Patent.

Bose failed to present evidence that SDI intended to cause others to infringe the '765 patent. Instead of providing positive evidence (either direct or circumstantial) concerning SDI's intent, Bose tried to argue (in essence) that there was *no* evidence to support the existence of SDI's opinion and belief that the patent is invalid.  This is erroneous.

First, Bose argues that it was improper to rely on an unverified interrogatory response, which it claims is the sole evidence of SDI's opinion.[10]  Setting aside the interrogatory response itself, Bose either *admitted* or placed into the record the following key facts: (1) only a few months after receiving notice of the patent, at a

---

[10] Bose did not raise this objection until its "Supplemental Memorandum," the second brief filed *after* the District Court's motion hearing.  (A6503-04)  The District Court did not address this argument in its written order.  (A45-74)  As an untimely raised argument (particularly where Bose did not dispute the statements of fact (A4755-56), the District Court was within its discretion to find the argument waived.  *See, e.g. Novosteel SA v. United States*, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002); *N. Am. Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 45 (1st Cir. 2001).  Moreover, the signature of SDI's agent (its attorney) can satisfy the verification requirement for interrogatory answers.  *See, e.g. Carramerica Realty Corp. v. nVidia Corp.*, No. C 05-00428JW, 2010 WL 2629760, at *3 n.4 (N.D. Cal. June 29, 2010).

meeting between Bose and SDI in March 2009, SDI representative disclosed U.S. Patent No. 6,026,150 ("the Frank patent") for the purpose of arguing that the '765 patent was invalid (A4755-56); (2) after that meeting failed to produce a settlement, SDI commissioned and received an opinion from George Oram of Arent Fox LLP (A4756); (3) Mr. Oram opined that all of the asserted claims of the '765 patent were invalid based on a combination of the Frank patent and the Van Der Muelen patent (A4756); (4) this opinion was reviewed by SDI's in house counsel, who is responsible for dealing with such matters (A5233-35); and (5) the Frank and Van Der Muelen patents were used by the PTO to reject all claims of the patent in a subsequent reexamination (A4757).

While Bose argues that SDI made no effort to demonstrate Mr. Oram's credentials or the reasonableness of the opinion (Bose Br., p. 54), that is nothing more than improper burden-shifting. If Bose wished to attack SDI's written opinion on the grounds that it was somehow incompetent, it was their obligation to do so. *See, e.g. Anderson*, 477 U.S. at 256-57. They did not. The unsupported assertion that a jury *might* disbelieve Defendants' witnesses does not satisfy its burden. *See Sears, Roebuck & Co. v. Goldstone & Sudalter*, 128 F.3d 10, 18 (1st Cir. 1997). The evidence of record, discussed above, establishes the existence of the opinion and SDI's reliance on that opinion.

Bose also argues that the testimony of its own damages expert, Michael Dansky, is an incompetent "opinion" concerning SDI's intent and therefore may not be relied upon for summary judgment.[11]  First, Mr. Dansky did far more than opine about intent.  He testified (with respect to SDI) that he understood it had an opinion of counsel that the '765 patent was invalid and observed that SDI's actions were consistent with its stated belief that the patent was invalid.  (A4534-35.)  This testimony not only confirms the existence of the opinion, but also that SDI's response to Bose was consistent with its stated belief that the patent was invalid.

What is more, in supporting its damages theory, Bose's expert took as a given that SDI believed the patent is invalid.  Thus, Bose's own expert based his damages theory on the premise (consistent with his assessment of the facts) that SDI believed the patents invalid.  Mr. Dansky's testimony constitutes an admission of a party opponent, which distinguishes it from the cases cited by Bose, where the party was seeking to proffer testimony about its own intent. *See, e.g. Holmes Grp., Inc. v. RPS Prods., Inc.*, No. 03-40146, 2010 WL 7867756, at 6 (D.Mass. June 25, 2010); *Borg Warner, Inc. v. Honeywell Int'l, Inc.*, 750 F. Supp. 2d 596, 611 (W.D.N.C. 2010).

---

[11] Mr. Dansky is a Bose retained expert, proffered on the subject of damages and licensing.  (A54-55.)

The district court, therefore, was proper in relying on this testimony, particularly after Bose did not dispute the statement of fact and failed to assert objections on its behalf.  (A4742)

The remainder of the arguments leveled at SDI's intent are unsupported mischaracterizations of the record.  Bose claims that SDI did not timely obtain an opinion (Bose Br., p. 56), despite the fact that SDI presented it with the very prior art that would be relied upon by the PTO to reject the claims of the '765 patent less than three months after receipt of the letter, well before the opinion was complete.  (A4755.)  Bose further argues that SDI's willingness to consider settlement is inconsistent with a belief that the patent was invalid.  (Bose Br., p. 56.)  This position is contradicted by the testimony of its own expert, who testified that SDI's actions could be consistent with a belief that the patent was invalid, as for example SDI may have realized that a settlement would be less costly that litigation.  (A4534-35.)

Finally, Bose argues that the Oram opinion was simply filed away upon receipt by SDI.  (Bose Br., p. 56)  This is false and cannot raise a genuine issue of fact.  SDI's counsel and corporate designee on intent testified that he received and reviewed the opinion, that it is his job to receive legal opinion letters, that he formed a belief that the patent was not valid, that he offered the business individuals an opportunity to review the letter, and that the business individuals

relied on (and accepted) his expertise in assessing such matters on behalf of the company.  (A5229-5235.)  None of these details approach the circumstances discussed above with respect to *Applied Medical Resources, Golden Blount, or Mentor.*  The case is also distinguishable from *Harris Corp. v. Ericsson Inc.,* where no decision-maker reviewed a non-infringement opinion based on an internal Ericsson memo.  *See* 417 F.3d 1241, 1259 (Fed. Cir. 2005).  Moreover, in *Harris*, Ericsson only prepared the memo for the opinion and the memo contained false or misleading information.  *Id*.

The fundamental difference here is that Bose *did not attack the credibility of the opinion*, and it could not have because the competency of that opinion is confirmed by the PTO's conclusion that the Frank and Van Der Muelen patents (and others) invalidate the '765 patent.  Appellees all relied on a combination of grounds to form their belief that the '765 patent is invalid, including the reexamination request.  Based on this request, the PTO held, and continues to hold, all claims of the '765 patent rejected, relying on combinations that include, but are not limited to, the Frank and Van Der Muelen patents.

### C. With Respect to the Common Products This Court Can Affirm the District Court on the Alternative Ground that Bose Failed to Establish A Material Issue of Fact Concerning Intent.

The only necessary portion of the district court's opinion concerning intent was the conclusion that Bose failed to demonstrate a material issue of fact with

respect to SDI's intent concerning its iW1 product. (A65) However, the district court made significant findings with respect to the other defendants, which represent an alternative ground for affirmance. *Hoyos*, 488 F.3d at 1; *see also N. Am. Specialty Ins.*, 258 F.3d at 37 (quoting *Perez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir. 2001).

> **1. The District Court's Conclusion Concerning the iW1 Compels A Finding of No Intent With Respect to SDI's Other Products.**

The evidence concerning SDI's demonstrated absence of intent to infringe (discussed above) is equally applicable to SDI's Common Products. Since the Oram opinion and the reexamination proceedings relate to invalidity, there is no principled distinction between SDI's intent on the iW1 and the Common Products. SDI did not form the specific intent to infringe the '765 patent with respect to any of the Common Products. This forms an alternative ground for affirming the district court's judgment of non-infringement.

> **2. The District Court's Findings Support the Alternative Ground that Imation Lacked The Necessary Intent to Indirectly Infringe the '765 Patent.**

As with SDI, there is no evidence that Imation intended to cause an infringement of the '765 patent. As discussed above, the undisputed evidence demonstrates that Imation lacked an intent to cause a third party to infringe the '765 patent, because, at all relevant times, Imation believed the '765 patent was

invalid: (1) Imation first received notice of the '765 patent on December 16, 2008 (A56; A4746); (2) Imation's inside counsel concluded that the claims were either not infringed or invalid (A56-57, A4746-48); (3) Imation's counsel contacted outside counsel, who provided oral and written opinions that the patent was invalid or not infringed (A57, A4748, A4749); (4) Imation later discussed the '765 patent with Mr. Himich, who informed Imation of his independent opinion that the '765 patent was invalid (A4750, A4753); (5) Himich filed with the PTO a request for reexamination of every claim of the patent based on an analysis of the Frank and Van Der Muelen patents, as well as other prior art (A4742, A4743); (6) in the reexamination, the PTO rejected all claims of the '765 patent (A4743-45); and (7) during the course of the reexamination, Imation was made aware of the current status of the reexamination and filings, including the PTO's conclusions with respect to the patent's invalidity.  (A4743-45, 4750).  Imation relies on these opinions.

The district court's factual findings support the conclusion that no reasonable juror could conclude that Imation harbored an intent to cause infringement of the '765 patent.  Thus, it would be proper for this Court to affirm on this alternative theory.

### 3. The District Court's Findings Support the Alternative Ground that DPI Lacked The Necessary Intent to Indirectly Infringe the '765 Patent.

There is no evidence that DPI intended to cause an infringement of the '765 patent. At all relevant times DPI lacked any belief that use of its products by its customers infringed the '765 patent, because it believed the patent was invalid or not infringed: (1) when DPI first became aware of the '765 patent in early 2009 (A57, A4751), DPI's President and a DPI engineer reviewed Bose's claim of infringement and concluded that DPI's products did not infringe (A57-58, A4751-52); (2) after counsel for Bose clarified its allegations, DPI again concluded that this infringement allegation was not credible (A57-58, A4752-53); (3) after Bose filed suit, DPI retained Mr. Himich, who gave an oral opinion that the '765 patent was invalid  (A4753-54); (4) as discussed above, he filed a request for reexamination of all the claims of the '765 patent showing why every claim was invalid and the PTO agreed with Himich's conclusions; (6) DPI was informed about reexamination filings and relied on all of the opinions identified, including that of the PTO.  (A4742-45)

In light of the record evidence, Bose cannot raise a genuine issue of material fact regarding DPI's intent.  It would be proper for this Court to affirm on this alternative theory.

### D.      Bose Waived Any Right to a Trial On "Future Infringement"

In its brief, Bose argues that it is entitled to a trial on infringement and

validity despite the finding of no intent, in order to address "future infringement."

(Bose Br. at 63.)  That argument should be rejected because it was not presented

below.  Bose *elected* to immediately appeal its loss at summary judgment rather

than pursue claims for alleged future infringement based on the remaining one

product before the trial court.  Whatever its reason for choosing that course, the

effect of Bose's failure to request that the trial court proceed with a validity and

infringement trial, either before, during, or after the summary judgment decision,

or in its request for the entry of judgment filed many months later, constitutes a

waiver.  *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of

course, that a federal appellate court does not consider an issue not passed upon

below.").  Bose may not now ask this Court for that remedy.

## <u>CONCLUSION</u>

For the reasons set forth above, Appellees respectfully submit that the

Judgment of the district court was correct and should be affirmed.

Respectfully Submitted,

By: <u>/s/ Matthew B. Lowrie</u>
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Telephone: 617-342-4000
Facsimile: 617-342-4001
Matthew B. Lowrie, Esq.
mlowrie@foley.com
Aaron W. Moore, Esq.
amoore@foley.com
*Attorneys for SDI Technologies, Inc*

By: <u>/s/ Michael L. Nepple</u>
THOMPSON COBURN LLP
One U.S. Bank Plaza
St. Louis, MO 63101
Telephone: 314-552-6000
Facsimile: 314-552-7000
Michael Lee Nepple, Esq.
mnepple@thompsoncoburn.com
David B. Jinkins, Esq.
djinkins@thompsoncoburn.com
*Attorneys for Appellees Imation Corp.,*
*Memorex Products, Inc. and DPI, Inc.*

# United States Court of Appeals
## for the Federal Circuit

BOSE CORPORATION v. SDI TECHNOLOGIES, INC. et al., 2013-1347

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by FOLEY & LARDNER LLP, Attorneys for Appellee SDI to print this document. I am an employee of Counsel Press.

On **September 19, 2013**, Counsel for Appellee has authorized me to electronically file the foregoing **Joint Brief for Appellee** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Mark Joseph Hebert, I
Jolynn M. Lussier
Fish & Richardson, P.C.
One Marina Park Drive
Boston, MA 02210
617-542-5070
hebert@fr.com
lussier@fr.com
*Attorney for Bose Corporation*

Dale A. Malone
Law Office of Dale A. Malone
79 Forest Avenue
Cohasset, MA 02025
617-674-4031
dmalone@mylitigationcounsel.com
*Counsel for 3XM*
(U.S. MAIL ONLY)

Paper copies will also be mailed to the above counsel on this date.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

September 19, 2013

/s/ Robyn Cocho
Counsel Press

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  _X_    The brief contains <u>13,851</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

\_\_\_\_ The brief uses a monospaced typeface and contains \_\_\_\_\_ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  _X_    The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2007</u> in a <u>14</u> point <u>Times New Roman</u> font or

\_\_\_\_ The brief has been prepared in a monospaced typeface using_____ _____in a \_\_\_ characters per inch_____ font.

<u>September 19, 2013</u>

                 <u>/s/ Matthew B. Lowrie</u>
                 Matthew B. Lowrie
                 *Attorneys for Appellee*
                 *SDI Technologies, Inc*